UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DORIEN BOWERS,

        Plaintiff,

        - against -

URS CORPORATION,

        Defendant.
------------------------------------------------------------------x

**COMPLAINT**

Civil Action No.
05 Civ. 2862 (TPG)(FM)

JURY TRIAL
REQUESTED

Plaintiff DORIEN BOWERS, by and through her attorney, Margaret McIntyre, Attorney at Law, as and for her Complaint, alleges the following:

## INTRODUCTION

1. This is an action for injunctive and declaratory relief, back pay, front pay, compensatory and punitive damages, attorneys' fees, costs and other relief to redress employment discrimination on the basis of race, color and sex, as well as for retaliation for plaintiff's opposition to discriminatory practices. This action is brought pursuant to Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e *et seq.*; the Civil Rights Act of 1871, 42 U.S.C. §1981; and § 8-107(a) of the Administrative Code of the City of New York.

## JURISDICTION AND VENUE

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4). In addition, plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367(a).

3. Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged below were committed within this district.

PARTIES

4.   Plaintiff Dorien Bowers ("plaintiff"), who is an African-American woman, is a resident of the State and City of New York and the County of Kings.  She maintains her residence at 205 Clinton Avenue, Apt. 6C, Brooklyn, New York 11205, telephone number (718) 802-1731.

5.   Defendant URS Corporation ("defendant") is, upon information and belief, a for-profit corporation authorized to do business in the State of New York and is a global engineering services firm.  Defendant maintains its New York office at One Penn Plaza, Suite 610, New York, New York 10119, telephone number (212) 736-4444.

6.   Defendant employs approximately 26,000 employees worldwide and is therefore an employer within the meaning of 42 U.S.C. § 2000e-(b) and of §8-102 of the Administrative Code of New York City.

ADMINISTRATIVE HISTORY

7.   Plaintiff filed a charge of employment discrimination against defendant based on race, color, sex and retaliation with the United States Equal Opportunity Employment Commission (hereinafter "EEOC") on or about October 16, 2003, which was within 300 days of the last incident of discrimination.

8.   On or about December 15, 2004, the EEOC issued plaintiff a Notice of Right to Sue.  This complaint has been filed within 90 days of plaintiff's receipt of the EEOC's Notice of Right to Sue.

9.   Pursuant to §8-502(c) of the Administrative Code of the City of New York, a copy of this complaint has been served upon the New York City Law Department and the City of New York Commission on Human Rights.

FACTS

10. Plaintiff was employed by defendant for over two and a half years before her employment was terminated on July 11, 2003. At all relevant times herein, plaintiff was qualified to perform the positions she held while employed by defendant.

11. Plaintiff joined defendant in December 2000 as an Accounting Manager, with an annual salary of $70,000. She was a salaried employee but was eligible for pre-approved overtime pay at one times her hourly rate of pay of $33.66 per hour.

12. Plaintiff's responsibilities included overseeing and implementing company policies and procedures to ensure accurate billing and collection of all company projects. To do so, she supervised an accounting staff of seven employees and trained project managers on financial management, budgets and reporting systems. She also prepared weekly and monthly reports for review by senior management to ensure that project budgets were maintained or properly adjusted when adjustments became necessary. Plaintiff was also instrumental in the implementation defendant's new computer system. She traveled to Texas to be trained by the system designer and then assumed responsibility for training all accounting staff in New York on the new computer system.

13. Plaintiff reported to Bob Harrison, Regional Controller, who worked out of defendant's Rocky Hill, Connecticut office. Jay Gewirtzman, Office Manager in the New York office, also functioned as plaintiff's supervisor on day-to-day matters, as did Nancy Bodnar, Regional Controller based in the Paramus, New Jersey office.

14. Plaintiff had been told by Bob Harrison, at her interview for the job, that she was being hired to replace an outgoing Accounting Manager. When plaintiff started the job, she learned that there had never been an Accounting Manager in the department in New York. There was

3

an Accounting Supervisor, but that employee remained in place, and plaintiff's hiring was actually part of a reorganization designed to fix chronic problems within the department.

15. In or about May 2001, Laura Sabatino, an accountant in the Rocky Hill, Connecticut office who worked closely with Bob Harrison, told plaintiff that plaintiff had been hired because she was African-American and it was felt that members of the accounting staff, most of whom were African-American, would take better direction from a person of the same race.

16. In April 2001, plaintiff received her first performance evaluation from defendant. The review noted that plaintiff's first several months had been consumed with addressing staff, billing and collection issues, on which she had "done a great job." The review also referenced the decreases, since plaintiff's arrival in December 2000, in billed accounts receivables from $28.9K to $23.6K and an unbilled decrease from $7.8K to $5.2K, for an overall decrease of 22% in account receivables.

17. In September 2001, plaintiff received a positive annual performance review. In his notes on the review, Bob Harrison referred to plaintiff as "a major asset to URS New York office."

18. Following his issuance of plaintiff's performance review in September 2001, Bob Harrison told plaintiff that all raises were capped at 3% for that year, so she would receive a 3% raise immediately. He also told plaintiff that to adequately compensate her for her performance in 2001, she would receive an additional 3% raise in January 2002.

*Defendant's Discriminatory Denial of Overtime Pay to Plaintiff*

19. In June 2001, plaintiff was paid by defendant for overtime hours worked during a two-week period. Subsequent to that, plaintiff noted overtime on her time sheet, and Bob Harrison told her that she could not be paid overtime because she was a manager. He told her that in the future

4

when she worked overtime she should simply take compensatory time instead of requesting overtime pay.

20. While plaintiff was denied overtime pay, defendant consistently paid overtime to a similarly situated white male employee, Roger Stack. Upon information and belief, Roger Stack, the Accounting Manager in Paramus, New Jersey, regularly received overtime pay for the hours he worked in excess of forty hours per week.

21. In or about October 2001, because plaintiff had been unable to take the time off that she had accrued by working overtime, plaintiff complained to Bob Harrison, and to Human Resources, that she was not being adequately compensated. Plaintiff attended a meeting with Mr. Harrison and Tracey Kohrherr, an official of defendant's Human Resources Department, which was held to address the issue. Plaintiff's request for overtime or at least clarity on when she could use her compensatory time went unaddressed. However, at the meeting, Bob Harrison, for the first time, criticized plaintiff's management skills.

22. Plaintiff's struggles to receive adequate overtime and/or compensatory time for the long hours she worked continued throughout her employment.

*Defendant's Discriminatory Denial of Plaintiff's Raise*

23. On Friday, January 18, 2002, plaintiff informed Bob Harrison that she intended to use compensatory time to take off the Martin Luther King holiday on the following Monday, January 21, 2002.

24. Jay Gewirtzman, Office Manager, approved plaintiff's request to take the day off and ultimately determined that plaintiff was entitled to be paid for the day.

25. Bob Harrison was upset with plaintiff for taking off Martin Luther King Day and told plaintiff that she would not be paid for the day because she was not authorized to use

5

compensatory time except during the week she earned it. That was the first Mr. Harrison had stated there was a requirement that compensatory time be used in the week it was earned. (Later, when plaintiff used her compensatory time on Fridays, Bob Harrison criticized her for doing that.)

26. In the weeks following Martin Luther King Day, Bob Harrison treated plaintiff with hostility. He began to set unrealistic goals for her so that he could criticize her if the goals were not met. His criticisms were often delivered in disparaging tones, and he sometimes yelled at plaintiff. Mr. Harrison blamed plaintiff problems that had existed in the accounting department before plaintiff arrived.

27. In February 2002, plaintiff asked Bob Harrison when she would be receiving the additional 3% raise he had promised her. Bob Harrison said that she would not be receiving the raise after all, citing unfounded criticism of plaintiff's work performance.

28. Subsequently, on at least two occasions, Bob Harrison admitted to plaintiff that she was not getting the additional 3% raise because he was upset with her for taking off Martin Luther King Day.

*Internal Complaints of Discrimination based on Race and Gender*

29. On or about February 18, 2002, plaintiff complained to Tracey Kohrherr, an official in defendant's Human Resources Department, that Bob Harrison was discriminating against her based on her race and gender. She stated that she believed that his denial of a previously promised raise was an over-reaction to her use of compensatory time to take off Martin Luther King Day and that the over-reaction was racially motivated. She also complained that other managers were not being denied overtime pay.

30. Bob Harrison often referred to women, including plaintiff, as "girls." When plaintiff let him know she did not want to be referred to as a girl, Bob Harrison admitted to plaintiff that he had been "in trouble" over that habit in the past.

6

31. Bob Harrison frequently spoke to plaintiff in a rude and condescending manner, both in private and in front of the accounting staff.

32. Bob Harrison also regularly addressed female employees, particularly those holding lower ranks than him within the company, in a rude and condescending manner. By contrast, Mr. Harrison did not treat male employees with rudeness and condescension.

33. In or about April 2002, plaintiff received the raise she had been promised to receive in January. She was assured by Bob Harrison that the increase that became effective in April would not affect her year-end increase.

34. In or about August or September 2002, plaintiff reached out to Bob Harrison's supervisor, Mike Sperato, Divisional Controller for defendant's Eastern Division, for assistance with numerous issues about which plaintiff was having difficulties with Bob Harrison. Mike Sperato acknowledged that Bob Harrison's direction with respect to plaintiff had been inconsistent and told plaintiff that the regions were going to be divided differently and that plaintiff would soon have a new boss.

35. In or about September 2002, in a discussion regarding the removal of the New York office from Bob Harrison's responsibility, Mike Sperato said to plaintiff that what the department needed was a 35-year old Jew to run it. Plaintiff did not respond to Mr. Sperato's comment.

*Ongoing Retaliation*

36. In November 2002, Bob Harrison issued a negative performance evaluation to plaintiff. Mr. Harrison deliberately excluded Jay Gewirtzman from the review process. The evaluation contained many demonstrably false statements, which plaintiff protested in a detailed rebuttal to the evaluation.

37. In November 2002, Bob Harrison told plaintiff that she would not be receiving an annual salary increase because she had received an increase in April. Plaintiff pointed out that the raise in April had been the raise she had been promised she would receive in January but had not finally received until April. Mr. Harrison said that the rules had been changed.

38. In or about late November 2002, the accounting functions in New York were reorganized and Bob Harrison ceased being plaintiff's direct supervisor. Plaintiff began reporting to John Kuhn, who became acting Regional Controller in the New York office. Mr. Kuhn came to New York from San Francisco, where he served as a Regional Controller.

39. During the first few months of 2003, defendant's billing functions were transferred to defendant's Austin, Texas office. In February 2003, some of the billing employees in New York were laid off and some employees were sent to Austin.

40. Plaintiff began training new billing staff in New York and tying up loose ends related to the work done by the previous billing staff. This involved a tremendous amount of work and the entire department was approved for mandatory overtime pay, including plaintiff. When plaintiff reported her time and requested the overtime pay, Tracey Kohrherr told John Kuhn that plaintiff was not to receive overtime pay. Plaintiff explained her eligibility for overtime (as stated in her offer letter) to John Kuhn, who promised to address the issue.

*Defendant's Discriminatory and Retaliatory Denial of Promotions*

41. Throughout the spring of 2003, plaintiff sought clarification of her role in the reorganized company. John Kuhn repeatedly assured plaintiff that her future was secure and that she should just be patient with having to handle primarily clerical functions during the transition.

8

42. Although John Kuhn seemed to value plaintiff's contributions to the company, he also at times made inappropriate comments to plaintiff that indicated gender and racial bias.

43. On or about February 14, 2003, John Kuhn asked plaintiff how much money he would have to pay her for her to show him her breast.

44. On or about April 23, 2003, which was "Secretary's Day," plaintiff jokingly asked John Kuhn why she had not received flowers. Her joke was a reference to her previously discussed concerns that her skills were not being utilized while she was performing largely clerical functions. Mr. Kuhn responded to plaintiff by asking what he should buy her flowers for, "welcome to the hood day?" Later in the day, plaintiff approached John Kuhn again and told him she had been offended by his earlier comment. He said that he did not think he was better than plaintiff, that he had been raised with black people and that was why he danced so well.

45. In or about March 2003, John Kuhn informed plaintiff that there would be an opening for a Regional Controller position, to be based in the New York office. Plaintiff expressed her interest in the position. Mr. Kuhn told plaintiff that he would alert her as soon as the job was posted.

46. Plaintiff was qualified for the position of Regional Controller.

47. In or about late May 2003, plaintiff applied for the open position of Regional Controller in defendant's office in Atlanta. Mike Sperato was the official who would make the hiring decision.

48. Plaintiff was never interviewed for the Atlanta Regional Controller position, despite repeated assurances from Tracey Kohrherr that Mike Sperato would shortly be contacting her for an interview.

49. On or about July 9, 2003, plaintiff learned that the Regional Controller position in New York was being posted. Plaintiff applied for it the next day, July 10, 2003.

50. Upon information and belief, the position of Regional Controller based in New York was subsequently filled by a white man.

51. Plaintiff was never interviewed for or offered a Regional Controller position with defendant.

*Discriminatory and Retaliatory Termination*

52. In or about June 2003, plaintiff again approached John Kuhn about her outstanding overtime pay and about her concerns that her problems with Bob Harrison were affecting her role in the company. Mr. Kuhn asked plaintiff what it would take to resolve the situation. Plaintiff responded that she wanted to be paid for past overtime and to have a document placed in her file outlining the unfair way in which she had been treated by Bob Harrison.

53. At a meeting with Tracey Kohrherr in late June 2003, plaintiff was told that she would finally be receiving her outstanding overtime pay. Plaintiff asked Tracy Kohrherr what would be done to protect her reputation from the unfounded criticism leveled against her by Bob Harrison. Plaintiff expressed her concern that what Bob Harrison had said and done would mean plaintiff had no future at URS. Ms. Kohrherr assured plaintiff that her rebuttal to her last performance evaluation had recorded what had really happened. Ms. Kohrherr also said that John Kuhn's excellent review, and the salary increase that Mr. Kuhn approved for plaintiff, would suffice to counter Bob Harrison's negative statements. Plaintiff then asked what actions would be taken to ensure that Bob Harrison did not treat another black woman in the way he treated plaintiff. Ms. Kohrherr responded that Bob Harrison was not her responsibility but the responsibility of Jenny Caruso, the Human Resources representative for the Rocky Hill, Connecticut office, which was Bob Harrison's home office.

54. On or about July 1, 2003, plaintiff was finally paid for the outstanding overtime compensation that she had earned.

10

55. On July 11, 2003, plaintiff's employment with defendant was terminated. She was told by John Kuhn that her responsibilities were transferred to Austin. Tracey Kohrherr told plaintiff that her termination was part of a reduction in force.

56. Plaintiff's termination came while plaintiff had a job application pending for the Regional Controller job in Atlanta, for which she applied in May, and one day after she applied for the position of Regional Controller in New York, both open positions for which plaintiff was well qualified.

57. At the time of plaintiff's termination, there was an Accounting Manager position open in Maryland. Officials of defendant were well aware that plaintiff was willing to relocate to other positions within the company around the country. Thus, even if there were no work for plaintiff in New York, defendant could have offered plaintiff the opportunity to make a lateral transfer to the open position in Maryland. Defendant did not do so.

*Discriminatory Denial of Severance Pay*

58. At the time of her termination, plaintiff was paid severance pay equal to approximately nine days of pay.

59. Upon information and belief, defendant's accounting management and staff members at the level of Grade P4 and above, irrespective of their years of service, were offered severance packages consisting of six months pay when they were laid off as a result of the centralization of the accounting function in Austin, Texas.

60. Plaintiff was a Grade P4 at the time of her termination.

61. Upon information and belief, defendant's denial of severance pay to plaintiff in an amount equal to what was paid to employees similarly situated to plaintiff was motivated by retaliation.

62. Based on the foregoing, plaintiff charges defendants with discriminating against her in the terms, conditions and privileges of employment, on the basis of her race, color and gender and retaliating against her for her complaints of discrimination.

### AS AND FOR A FIRST CAUSE OF ACTION

63. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 62 of this complaint as if fully set forth herein.

64. Defendant's acts, practices, and policies described herein constitute intentional discrimination against plaintiff on the basis of her race, color and gender, in violation of 42 U.S.C. § 2000e *et seq.*

### AS AND FOR A SECOND CAUSE OF ACTION

65. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 64 of this complaint as if fully set forth herein.

66. Defendant's acts, practices, and policies described herein constitute intentional discrimination against plaintiff on the basis of her race, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1981.

### AS AND FOR A THIRD CAUSE OF ACTION

67. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 66 of this complaint as if fully set forth herein.

68. Defendant's acts, practices, and policies described herein constitute intentional discrimination against plaintiff on the basis of her race, color and gender, in violation of §8-107(a) of the Administrative Code of the City of New York.

## AS AND FOR A FOURTH CAUSE OF ACTION

69. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 68 of this complaint as if fully set forth herein.

70. Defendant's acts, practices, and policies described herein constitute retaliation against plaintiff for her complaints of race and gender discrimination, in violation of in violation of 42 U.S.C. § 2000e *et seq.*

## AS AND FOR A FIFTH CAUSE OF ACTION

71. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 70 of this complaint as if fully set forth herein.

72. Defendant's acts, practices, and policies described herein constitute retaliation against plaintiff for her complaints of race and gender discrimination, in violation of §8-107(a) of the Administrative Code of the City of New York.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

1. Declare, adjudge and decree that defendant discriminated against plaintiff in violation of 42 U.S.C. § 2000e *et seq.*

2. Declare, adjudge and decree that defendant discriminated against plaintiff in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1981.

3. Declare, adjudge and decree that defendant discriminated against plaintiff in violation of §8-107(a) of the Administrative Code of the City of New York.

4. Declare, adjudge and decree that defendant retaliated against plaintiff in violation of 42 U.S.C. § 2000e *et seq.*

5. Declare, adjudge and decree that defendant retaliated against plaintiff in violation of §8-107(a) of the Administrative Code of the City of New York.

6. Order defendant to pay plaintiff damages in the amount equal to the value of all back pay, plus interest thereon, that plaintiff lost as a result of defendant's discriminatory and retaliatory actions.

7. Order defendant to reinstate plaintiff in employment, with full seniority and all other benefits; or, in the alternative, award plaintiff front pay.

8. Enjoin defendant from engaging in further discriminatory or retaliatory actions against plaintiff.

9. Award plaintiff compensatory and punitive damages.

10. Award plaintiff all costs and reasonable attorney's fees incurred in connection with this action.

11. Award such other and further relief as this Court may deem just and proper.

Dated: March 15, 2005
New York, New York

---

MARGARET McINTYRE (MM 2099)
Attorney for Plaintiff
100 Church Street, Suite 1605
New York, New York 10007
(212) 227-9987